**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                :
PRINCETON INSURANCE COMPANY,    :
                                :    CIVIL ACTION NO. 06-599 (MLC)
     Plaintiff,                 :
                                :    MEMORANDUM OPINION
     v.                         :
                                :
CONVERIUM REINSURANCE           :
(NORTH AMERICA) INC.,           :
                                :
     Defendant.                 :
_____:
```

**COOPER, District Judge**

Plaintiff, Princeton Insurance Company, alleges defendant, Converium Reinsurance (North America) Inc., breached its obligations under a reinsurance treaty (the "Treaty").  (Dkt. entry no. 1, Rmv. Not., Ex. A, Compl.)  Defendant asserts a counterclaim for a judgment declaring that plaintiff is not entitled to recover from defendant under the Treaty.  (Dkt. entry no. 7, Ans. & Countercl.)  Plaintiff now moves for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(c).  (Dkt. entry no. 31).  Defendant opposes and cross-moves for summary judgment.  (Dkt. entry no. 33.)  For the reasons stated herein, the Court will (1) grant plaintiff's motion for summary judgment, and (2) deny defendant's cross motion for summary judgment.

## BACKGROUND

Plaintiff entered into the Treaty with Zurich Reinsurance Centre ("ZRC") in July 1995.  (Dkt. entry no. 15, Joint Statement

of Undisputed Material Facts ("Joint Facts"), at ¶ 1.)  Defendant
is ZRC's successor-in-interest.  (Id. at ¶ 2.)  The Treaty was
prepared by plaintiff's broker, First Re Intermediaries, Corp.
("First Re").  (Id. at ¶¶ 4-5.)  The Treaty was executed in July
1995.  (Dkt. entry no. 15, Decl. of Geoffrey T. Farrow ("Farrow
Decl."), Ex. A, Third Workers' Compensation and Employers'
Liability Excess of Loss Reinsurance Agreement ("Treaty"), at
D00014.)

    Article III of the Treaty provides, inter alia, that
defendant

> agrees to reimburse [plaintiff] on an excess of loss basis,
> for the amount of ultimate net loss which [plaintiff] may
> pay as a result of losses occurring on or after 12:01 A.M.,
> August 1, 1994, as respect new and renewal policies becomes
> effective after said date, covering Workers' Compensation
> and Employers' Liability classes of business as identified
> in APPENDIX A, subject to the underwriting criteria of
> ARTICLE IV, the underwriting guidelines of APPENDIX B,
> warranties of ARTICLE V and exclusions of ARTICLE VI . . .

(Treaty, at D00003.)

    Article VII of the Treaty further defines "ultimate net
loss" as "the sum actually paid by [plaintiff] in settlement of
losses for which it is held liable".  (Id. at D00007-8.)  The
"LIMITS OF COVER" provision in Exhibit A, Section 1 of the Treaty
further specifies that defendant "shall not be liable for any
loss until [plaintiff's] ultimate net loss in each occurrence
exceeds $1,000,000 and then [defendant] shall be liable for the
amount of [plaintiff's] ultimate net loss in each occurrence in

excess of $1,000,000 but the [defendant's] liability shall not exceed $1,500,000 in each occurrence." (Id. at D00015.) "Loss Occurrence" is defined in Article VIII as "each and every accident, occurrence, disaster, casualty or happening or series of accidents, occurrences, disasters, casualties or happenings arising out of one event." (Id. at D00008.)

Article V of the Treaty lists four warranties. (Id. at D00005-6.) The warranty at issue here provides: "[Plaintiff] warrants that the maximum Employers' Liability limits are as follows, or so deemed: i. Bodily Injury by Accident - $100,000 each accident". (Id. at D00006.) This amount was increased to "$500,000 each accident" as of January 1, 1995, through the issuance of "Addendum No. 1" and execution of "Endorsement No. 1". (Id. at D00021, D00023.)

The Treaty, as originally drafted, only covered plaintiff's workers' compensation and employers' liability obligations on policies written by plaintiff in New Jersey. (Joint Facts, at ¶ 6.) However, coverage for policies issued in other states, including New York, was added through the issuance of addenda and execution of endorsements. (Id. at ¶ 14.) Specifically, "Addendum No. 12" to the Treaty added the New York coverage as of October 1, 1997. (Treaty, at D00093-101.) At the time the New York coverage was added by "Endorsement No. 12" in March 1998, defendant was aware that, if plaintiff wrote a limit on

employers' liability coverage in any policy, such a limit would be unenforceable under New York law.  (Id. at D00092; Joint Facts, at ¶ 16.)  Plaintiff, however, was not aware at that time that such a policy limit would be unenforceable under New York law.  (Joint Facts, at ¶ 16.)

Plaintiff issued a workers' compensation and employers' liability insurance policy (the "Policy") to 1st Choice Metal & Steel Co., Inc. ("1st Choice Metal") in August 1998.  (Joint Facts, at ¶ 17; Farrow Decl., Ex. B, Workers' Compensation And Employers' Liability Insurance Policy ("Policy").)  The Policy coverage period was from July 23, 1998 to July 23, 1999.  (Joint Facts, at ¶ 18.)  The Policy contained a limit on employers' liability coverage of $100,000 per accident.  (Id.)  The parties agree that the Policy was included within the risks covered by the Treaty.  (Id. at ¶ 19.)

Xing Zhang ("Zhang"), the president of 1st Choice Metal, fell from a roof of a building in Brooklyn, New York, and sustained injuries on September 13, 1998.  (Id. at ¶¶ 20-21.) Zhang subsequently filed a workers' compensation claim against 1st Choice Metal with the New York Workers' Compensation Board. (Id. at ¶ 22.)  This workers' compensation claim was covered by the Policy.  (Id. at ¶ 23.)  Plaintiff paid approximately $244,000 of statutory workers' compensation benefits to Zhang as of October 2002.  (Id. at ¶ 24; Farrow Decl., at ¶ 22.)

4

Zhang also filed a separate civil action in the New York Supreme Court against the owner of the property where the building he fell off of was located.  (Joint Facts, at ¶ 25.) The owner filed a third-party action against 1st Choice Metal seeking indemnification for this claim.  (<u>Id.</u> at ¶ 26.)  The third-party complaint was covered by the Policy as employers' liability.  (<u>Id.</u> at ¶ 27.)

Zhang entered into a settlement agreement with 1st Choice Metal and plaintiff on October 23, 2002.  (<u>Id.</u> at ¶ 29; <u>see</u> Farrow Decl., Ex. C, Settlement Agreement.)  Plaintiff paid Zhang $4,434,452.57 under the settlement agreement (the "Zhang settlement").  (Joint Facts, at ¶ 30.)  The settlement agreement states that "this agreement shall fully and finally dispose of [Zhang's] workers' compensation claim, as well as the matter pending before the Court."  (Settlement Agreement, at 3.)

Defendant ultimately denied plaintiff's request for reimbursement of the Zhang claim in August 2004, asserting, <u>inter alia</u>, that plaintiff's ultimate net loss as to the Zhang claim had not exceeded $1,000,000, as required by the Treaty.  (<u>Id.</u> at ¶ 32; Farrow Decl., Ex. I, 8-24-04 Denial Letter.)  Defendant explained this was because (1) under the Treaty, only $500,000 of Zhang claim could be ceded to the Treaty as employers' liability loss, (2) the "vast bulk of the payments made" as to the Zhang claim were to resolve Zhang's employers' liability claim, not the

workers' compensation claim, and (3) the amount of workers' compensation paid to Zhang under the Policy, in addition to the amounts paid under the settlement agreement, was not enough so that plaintiff's ultimate net loss exceeded the $1,000,000 retention.  (8-24-04 Denial Letter.)

Plaintiff brought an action in New Jersey state court, alleging defendant breached its obligations under the Treaty. (Rmv. Not., Ex. A, Compl.)  Defendant removed the action to this Court on the basis of diversity jurisdiction.  (Rmv. Not.) Defendant also asserted a counterclaim for a judgment declaring that plaintiff is not entitled to recover from defendant under the Treaty.  (Ans. & Countercl.)  Plaintiff now moves for summary judgment, arguing, inter alia, that the terms of the Treaty obligate defendant to reimburse plaintiff $1,500,000 for the Zhang claim.  (Dkt. entry no. 31, Pl. Br., at 19-24.)

Defendant opposes and cross-moves for summary judgment, arguing, inter alia, that plaintiff's ultimate net loss as to the Zhang claim has not exceeded $1 million as required by the Treaty because (1) the warranty provision in Article V, subsection (c)(i) limits the amount of plaintiff's employers' liability loss that can be ceded to the Treaty to $500,000, (2) the Zhang settlement (a) only finally settled Zhang's employers' liability claim, and not his workers' compensation claim and thus (b) only $500,000 of Zhang's employers' liability claim can be ceded to the Treaty due to the warranty limitation, (3) plaintiff paid

6

less than $300,000 of workers' compensation benefits under the
Policy on Zhang's workers' compensation claim, and therefore (4)
the Zhang claims against plaintiff never reached the $1 million
threshold for excess coverage under the Treaty.  (Dkt. entry no.
33, Def. Br., at 16-23, 25-28.)

**DISCUSSION**

**I.   Summary Judgment Standard**

Rule 56(c) provides that summary judgment is proper if the
pleadings, the discovery and disclosure materials, and any
affidavits show that there is no genuine issue as to any material
fact and that the movant is entitled to judgment as a matter of
law.  Id.  The summary judgment movant bears the initial burden
of showing that there is no genuine issue of material fact.
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the
movant has met this prima facie burden, the non-movant must set
out specific facts showing that there is a genuine issue for
trial.  Fed.R.Civ.P. 56(e)(2).  A non-movant must present actual
evidence that raises a genuine issue of material fact and may not
rely on mere allegations.  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable
to the non-movant when deciding a summary judgment motion.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587 (1986).  At the summary judgment stage, the Court's role is

7

"not . . . to weigh the evidence and determine the truth of the
matter but to determine whether there is a genuine issue for
trial." Anderson, 477 U.S. at 249.  Under this standard, the
"mere existence of a scintilla of evidence in support of the
[non-movant's] position will be insufficient [to defeat a Rule
56(c) motion]; there must be evidence on which the jury could
reasonably find for the [non-movant]." Id. at 252.  "By its very
terms, this standard provides that the mere existence of some
alleged factual dispute between the parties will not defeat an
otherwise properly supported motion for summary judgment; the
requirement is that there be no genuine issue of material fact."
Id. at 247-48 (emphasis in original).  A fact is material only if
it might affect the action's outcome under governing law. Id. at
248.  "[T]here is no issue for trial unless there is sufficient
evidence favoring the nonmoving party for a jury to return a
verdict for that party.  If the evidence is merely colorable, or
is not significantly probative, summary judgment may be granted."
Id. at 249-50 (internal citations omitted).

## II.  Choice of Law Analysis

Defendant removed this action to this court on the basis of
diversity jurisdiction.  (Rmv. Not.)  A district court hearing a
diversity case must apply the law of the forum state, including
its choice of law provisions. Woessner v. Air Liquide Inc., 242
F.3d 469, 472 (3d Cir. 2001).  Thus, this Court must apply New
Jersey's choice of law rules. Id.

8

New Jersey's choice of law analysis consists of two steps. Rowe v. Hoffman-LaRoche, Inc., 189 N.J. 615, 621 (N.J. 2007). The Court first must determine whether an actual conflict exists between the laws of the interested states. Id. Any such conflict is to be decided on an issue-by-issue basis. Id. There is no actual conflict if the laws of the interested states would produce the same result on the particular issue presented. Williams v. Stone, 109 F.3d 890, 893 (3d Cir. 1997) (noting that this situation is a "false conflict") (quotation and citations omitted). If there is no actual conflict as to a particular issue, the Court is to avoid the choice-of-law question and apply New Jersey law to that issue. Lebegern v. Forman, 471 F.3d 424, 428 (3d Cir. 2006); Williams, 109 F.3d at 893.

If the Court determines an actual conflict exists as to a particular issue, then the second step of the analysis requires the Court to (1) identify the governmental policies underlying the law of each state, (2) determine whether those policies are affected by each state's contacts to the litigation and to the parties, and then (3) apply the law of the state with the greatest interest in governing the particular issue. Rowe, 189 N.J. at 621-22.

When interpreting an insurance contract in particular, the law of the place of the contract "generally comports with the reasonable expectations of the parties concerning the principal

9

situs of the insured risk". Gilbert Spruance Co. v. Pa. Mfrs. Ass'n Ins. Co., 134 N.J. 96, 102 (N.J. 1993) (quotation and citation omitted). Thus, that law should apply "unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield." Id. (quotation and citation omitted). The place of contracting is the place where the parties executed and delivered the insurance policy. NL Indus., Inc. v. Commercial Union Ins. Co., 65 F.3d 314, 320 n.4 (3d Cir. 1995). If a company from another state uses an insurance broker to negotiate and purchase its insurance policies, then the place of contracting is the place where the broker negotiated the policies. Id.[1]

    Defendant contends that New York law should apply here, as (1) the place of contracting was New York, as First Re, the

---

[1] Seven factors are to be considered when determining whether the law of a state other than the place of contracting has the requisite "dominant relationship." NL Indus., Inc., 65 F.3d at 320. These factors are (1) the needs of the interstate and international systems, (2) the relevant policies of the forum, (3) the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability, and uniformity of result, and (7) ease in the determination and application of the law to be applied. Id. The Court may also consider a number of "contacts" in this analysis. Gilbert Spruance Co., 134 N.J. at 103. These "contacts" include the (1) place of contracting, (2) place of performance, and (3) domicile, residence, nationality, place of incorporation, and place of business of the parties. Id.

Treaty's broker, was located and negotiated the Treaty in New York, (2) the Treaty was signed by defendant in New York, and (3) New York has the dominant and significant relationship to the parties and the facts presented, as (a) the insured risk was the Policy issued by plaintiff to 1st Choice Metal, a company located in New York, (b) Zhang's accident occurred in New York, and (c) Zhang's workers' compensation and employers' liability claims were both filed in New York. (Def. Br., at 15-16.)  Plaintiff argues that defendant has not discussed how New York law and New Jersey law differ here, and thus, New Jersey law should apply. (Pl. Br., at 11 n.3.)  The Court cannot discern any actual conflict between the laws of New York and New Jersey applicable to the issues of reinsurance contract interpretation, except where otherwise noted <u>infra</u>.  Thus, the Court will apply New Jersey law when interpreting the terms of the Treaty.  <u>See</u> <u>Lebegern</u>, 471 F.3d at 428.

## III. Reinsurance Contracts Generally

Reinsurance is a contract by which one insurer insures the risks of another insurer.  <u>Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.</u>, 979 F.2d 268, 271 (2d Cir. 1992).  When an insurer, the "reinsured", wishes to transfer some of the risk it has undertaken under a policy it has issued, it "cedes" all or a portion of that risk to another insurance company, a "reinsurer." <u>Id.</u>; <u>British Ins. Co. of Cayman v. Safety Nat. Cas.</u>, 335 F.3d

205, 211-12 (3d Cir. 2003).  Reinsurance serves to (1) diversify the risk of loss, and (2) reduce the need for required insurance reserves.  British Ins. Co. of Cayman, 335 F.3d at 212.[2]

A reinsurance contract confers no rights on the insured party in an underlying policy, and the reinsurer is not directly liable to that insured party.  British Ins. Co. of Cayman, 335 F.3d at 212.  Settlements of claims made by insured parties on underlying policies, as well as the investigation and defense of these claims, are the sole responsibility of the reinsured.  Id. at 214.  Therefore, settlements, by the express terms of the reinsurance contract, are binding on the reinsurer.  Id.  The reinsurer's only obligation is to indemnify the reinsured on the risk transferred.  Id. at 212.

A reinsurer cannot be held liable for a kind of loss that it did not agree to cover, however.  N. River Ins. Co. v. Cigna Reins. Co., 52 F.3d 1194, 1206-07 (3d Cir. 1995).  Thus, the reinsurer retains the right to question whether the reinsured's liability stems from an unreinsured loss.  Id. at 1199-1200.  A loss would be unreinsured if it was (1) not contemplated by the underlying policy, or (2) expressly excluded by the terms of the

_____

[2] There are two types of reinsurance.  Christiana Gen. Ins. Corp. of N.Y., 979 F.2d at 271.  Treaty reinsurance obligates the reinsurer to accept in advance a portion of certain types of risks that the ceding company underwrites.  Id.  Facultative reinsurance, by contrast, covers only a particular risk or a portion of it, which the reinsurer is free to accept or not.  Id.

reinsurance contract.  <u>Id.</u> at 1200; <u>see also</u> <u>Bellefonte Reins.</u>
<u>Co. v. Aetna Cas. & Sur. Co.</u>, 903 F.2d 910, 912-14 (2d Cir. 1990)
(affirming district court's grant of summary judgment in favor of
reinsurer because express language in reinsurance contract
excluded reinsured's claimed loss).

**IV.   Interpretation of Reinsurance Contracts**

Reinsurance contracts are governed by the rules of
construction applicable to contracts generally.  <u>British Ins. Co.</u>
<u>of Cayman</u>, 335 F.3d at 212; <u>Christiana Gen. Ins. Corp. of N.Y.</u>,
979 F.2d at 274.  Under New Jersey law, the initial determination
of whether contractual language is clear or ambiguous is a
question of law for the Court.  <u>Jackson Hewitt Inc. v. Childress</u>,
No. 06-909, 2008 WL 199539, at *5 (D.N.J. Jan. 22, 2008).

A contract is unambiguous if the contractual language at
issue is subject to only one reasonable interpretation.  <u>Reed</u>
<u>Elsevier, Inc. v. Inherent.com, Inc.</u>, No. 05-4048, 2006 WL
3827414, at *5 (D.N.J. Dec. 27, 2006).  "[T]he dispositive
question is whether [the nonmovant] provide[s] a reasonable
reading of the contract, raising a question of fact as to the
meaning of the contract and requiring resolution at trial."
<u>Newport Assocs. Dev. Co. v. Travelers Indem. Co. of Ill.</u>, 162
F.3d 789, 792 (3d Cir. 1998).

When determining whether contractual language is ambiguous,
New Jersey law permits the Court to consider the contract

language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation.  Am. Cyanamid Co. v. Fermenta Animal Health Co., 54 F.3d 177, 181 (3d Cir. 1995).  Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.  Id. at 181.[3]  Further, the Court should interpret the contract as a whole when making this determination.  Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp., 31 F.Supp.2d 389, 398 (D.N.J. 1998).

---

[3] New Jersey and New York law appear to differ in one respect here.  New York law requires the Court to determine whether ambiguity exists by "looking within the four corners of the document, not to outside sources".  Kass v. Kass, 91 N.Y.2d 554, 566 (1998).  New Jersey law, however, permits the Court to consider extrinsic evidence when deciding whether contractual language is ambiguous.  Am. Cyanamid Co., 54 F.3d at 181.  However, under either state's law, the Court is to also consider the contract as a whole, and may also consider the circumstances surrounding the formation of the contract, when making the ambiguity determination.  Id.; Assisted Living Assocs. of Moorestown, L.L.C., 31 F.Supp.2d at 398; Kass, 91 N.Y.2d 566 (noting that under New York law, the Court is to "examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.").  Moreover, even if the Court were restricted to the "four corners" of the Treaty here, and did not consider any "extrinsic evidence" in determining the ambiguity of the language of the Treaty, the Court would reach the same conclusion as discussed infra; thus, any difference between the two state's laws here is a false conflict.  See Williams, 109 F.3d at 893.

"A contract term is not ambiguous simply because the parties disagree about its construction", however.  D & D Assocs., Inc. v. Bd. of Educ. of North Plainfield, No. 03-1026, 2007 WL 4554208, at *18 (D.N.J. Dec. 21, 2007).  Moreover, the Court will not "torture the language of a contract to create ambiguity." Assisted Living Assocs. of Moorestown, L.L.C., 31 F.Supp.2d at 398 (quotation and citations omitted).  "In other words, courts should not strain to find ambiguity but should, instead, hold parties to the contractual terms to which they agreed." Cornell Capital Partners, L.P. v. Eagle Broadband, Inc., No. 03-1860, 2006 WL 1098175, at *4 (D.N.J. Mar. 28, 2006).

If the contractual language is unambiguous, the Court may determine the meaning of the language as a matter of law at the summary judgment stage.  Reed Elsevier, Inc., 2006 WL 3827414, at *5.  The Court must enforce unambiguous contractual terms as written, according to their plain and ordinary meaning.  Assisted Living Assocs. of Moorestown, L.L.C., 31 F.Supp.2d at 398; Jados v. Isko, No. A-1889-06T3, 2007 WL 4118939, at *3 (N.J. App. Div. Nov. 21, 2007) (noting that "[c]ourts should not rewrite unambiguous agreements but should enforce the plain meaning evidenced by the writing.").  Where a contractual term is not explicitly defined in a contract, the Court may refer to the dictionary to determine the term's plain, ordinary meaning. Zurich Am. Ins. Co. v. Keating Bldg. Corp., 513 F.Supp.2d 55, 63 (D.N.J. 2007).

15

## V.    **The Treaty**

The parties' dispute here focuses on the interpretation of a provision in Article V, subdivision (c) of the Treaty providing, <u>inter</u> <u>alia</u>, that: "[Plaintiff] warrants that the maximum Employers' Liability limits are as follows, or so deemed: i. Bodily Injury by Accident - $100,000 each accident". (Farrow Decl., Ex. A, Treaty, at D00006.)  This amount was increased to "$500,000 each accident" as of January 1, 1995, through the issuance of "Addendum No. 1" and execution of "Endorsement No. 1". (<u>Id.</u> at D00021, D00023.)

Both parties argue that this language is unambiguous and supports their conflicting interpretations of the warranty provision. (Pl. Br., at 7-12; Def. Br., at 16-20.)  Plaintiff contends that under the unambiguous language of this provision, it "warranted that it would write policies with a maximum employers' liability limit of $100,000, later increased to $500,000." (Pl. Br., at 21.)  Plaintiff also argues that this provision "does not contain any language that suggests that it has or is intended to have any involvement with other aspects of the Treaty." (<u>Id.</u> at 10.)  Plaintiff also points to the (1) "LIMITS OF COVER" provision, (2) definition of "ultimate net loss", and (3) definition of "Loss Occurrence" in the Treaty, and notes that there is no "mention of how [the warranty provision]

16

applies to or affects the calculation of ultimate net loss." (<u>Id.</u> at 9-10.)

Defendant argues that the terms "maximum", "limits", and the "or so deemed" language in the warranty provision unambiguously indicate that $500,000 is the maximum amount of employers' liability loss that could be ceded to the Treaty.  (Def. Br., at 18-19.)  Defendant also contends that the language in Article III of the Treaty stating that defendant only is required to reimburse plaintiff "subject to" the warranties contained in Article V of the Treaty "evidences that the intent of the parties was to use the warranties to limit the amount of reimbursement that [defendant] could potentially owe to [plaintiff]."  (<u>Id.</u> at 19.)

The Court may examine the language of the warranty provision, as well as the contract as a whole, to determine whether it is ambiguous.  <u>Am. Cyanamid Co.</u>, 54 F.3d at 181; <u>Assisted Living Assocs. of Moorestown, L.L.C.</u>, 31 F.Supp.2d at 398.  The warranty provision states that plaintiff "warrants" that the maximum employers' liability limits will be $500,000.  (Farrow Decl., Ex. A, Treaty, at D00006, D00023.)  One of the definitions of "warrant" is "to give assurance of the nature of or for the undertaking of: guarantee."  <u>Webster's Third New Int'l Dictionary</u> 2578 (1986).  Similarly, the online version of the Oxford English Dictionary provides that one of the definitions of

17

"warrant" is to "undertake, pledge oneself to do something."
Oxford English Dictionary, online ed. at
http://dictionary.oed.com (last visited March 26, 2008).  Thus,
the plain meaning of the word "warrants" indicates that this
provision is a condition that plaintiff guaranteed or pledged to
undertake as a party to the Treaty.

The warranty provision at issue is placed in Article V,
under the heading "WARRANTIES", along with other "warranties"
that plaintiff agreed to undertake with regard to the policies it
issued, such as plaintiff's warranty that (1) all of the policies
it issued would be restricted to certain "authorized class
codes", (2) it would "retain a minimum of the first $50,000 in
each occurrence as well as 15% on both the First and Second
Casualty Excess of Loss Layers net and/or treaty" as to each
policy issued, and (3) it would follow certain underwriting
guidelines when issuing policies.  (Treaty, at D00005-6.)  Thus,
the warranty provision's placement in Article V indicates that,
under this provision, plaintiff guaranteed or pledged that it
would issue policies with no more than $500,000 of employers'
liability coverage per accident.  (See id.)

Defendant's interpretation that the warranty provision also
operates to limit the amount of employers' liability loss that
can be ceded to the Treaty is not reasonable, however, when the
warranty provision is examined in light of the provisions

18

pertaining to the calculation of ultimate net loss. (See Def.
Br., at 18-19.) As stated expressly in Article III, "[defendant]
agrees to reimburse [plaintiff] . . . for the amount of ultimate
net loss which [plaintiff] may pay". (Id. at D00004.) Thus, the
definition of "ultimate net loss" is what controls what can be
ceded to the Treaty, not the warranty provision. (See id.) None
of the provisions pertaining to the calculation of "ultimate net
loss" expressly state a limit on the amount of employers'
liability loss that can be ceded to the Treaty, nor do they refer
to an effect the warranty provision has on the calculation of
ultimate net loss. (See id. at D00004 (Article III, stating that
defendant "agrees to reimburse" plaintiff for "ultimate net
loss"); D00007-8 (Article VII, defining "ultimate net loss");
D00008 (Article VIII, defining "Loss Occurrence"); D00015
(Exhibit A, Section 1, stating defendant's obligation to
reimburse plaintiff $1.5 million for plaintiff's "ultimate net
loss" in excess of $1 million under Exhibit A, Section 1, "LIMITS
OF COVER").) These omissions are particularly relevant given
that, at the time the New York coverage was added to the Treaty,
defendant was aware that plaintiff's potential employers'
liability loss under a policy it issued could be limitless under
New York law. (See Joint Facts, at ¶ 16.)

The Court also disagrees with defendant's argument that the
language of Article III of the Treaty stating that defendant
"agrees to reimburse [plaintiff] . . . subject to the . . .

warranties of Article V" supports its interpretation of the
warranty provision.  (Def. Br., at 19.)  Given the unambiguous
meaning of the warranty provision and the ultimate net loss
provisions discussed <u>supra</u>, the words "subject to" do not
indicate that the warranty provision affects ultimate net loss;
rather, they indicate that plaintiff would not be entitled to
reimbursement if it breached any of the "warranties" it agreed to
undertake with regard to the policies it issued.  (<u>See</u> Treaty, at
D00004.)

The Court thus concludes, based on the plain language of the
warranty provision when construed in the context of the entire
Treaty, that the warranty provision unambiguously limits the
amount of employers' liability coverage that plaintiff can write
in a policy to $500,000, but does not provide for a $500,000
limit on the amount of employers' liability loss that can be
ceded to the Treaty.  Because the warranty provision is
unambiguous, the Court therefore must enforce it as written.  <u>See</u>
<u>Assisted Living Assocs. of Moorestown, L.L.C.</u>, 31 F.Supp.2d at
398; <u>Jados</u>, 2007 WL 4118939, at *3.

The warranty provision was not breached by plaintiff, as the
Policy issued to 1st Choice Metal limited employers' liability
coverage to $100,000.  (Joint Facts, at ¶ 18.)  It was only by
operation of New York law that the limit was unenforceable, and
thus plaintiff ultimately paid over $4 million on the Zhang

claims.  (<u>Id.</u> at ¶ 16.)  Moreover, neither the warranty provision
nor any other provision in the Treaty expressly limits the amount
of employers' liability loss that can be ceded to the Treaty as
ultimate net loss, as discussed <u>supra</u>.

The amount of the Zhang settlement, therefore, as a
settlement of loss claims made by an insured against plaintiff,
is binding on defendant by the express terms of the Treaty.  (<u>See</u>
Treaty, at D00004 (Article III, stating "[defendant] agrees to
reimburse [plaintiff] . . . for the amount of ultimate net loss
which [plaintiff] may pay as a result of losses"), D00007
(Article VII, defining "ultimate net loss" as "the sum actually
paid by [plaintiff] in settlement of losses for which it is held
liable").)  <u>See</u> <u>N. River Ins. Co.</u>, 52 F.3d at 1200 (noting that a
reinsurer is not liable for a loss that is "<u>expressly</u> excluded by
the terms" of the reinsurance contract) (emphasis added);
<u>Bellefonte Reins. Co.</u>, 903 F.2d at 912-14 (holding that reinsurer
was not liable for losses exceeding an "<u>express</u> cap on liability"
in reinsurance contract) (emphasis added).[4]

---

[4] Defendant argues that plaintiff's ultimate net loss did
not exceed the $1 million retention required by the Treaty, as
discussed <u>supra</u>.  For defendant to succeed on its cross motion
for summary judgment, the Court must not only agree with
defendant's argument with regard to the warranty provision
discussed <u>supra</u>; it must also agree with defendant's argument
that the settlement agreement only settled Zhang's employers'
liability claim, and not the workers' compensation claim.  (<u>See</u>
Def. Br., at 25-28.)  Because the Court has determined that the
warranty provision at issue here does not limit the amount of

**CONCLUSION**

For the reasons stated <u>supra</u>, the Court will grant plaintiff's motion for summary judgment, and deny defendant's cross motion for summary judgment.  The Court will issue an appropriate order and judgment.

s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

**Dated:** March 27, 2008

---

employers' liability loss that can be ceded to the Treaty, as discussed <u>supra</u>, the Court need not determine what, if any, portion of the amount paid by plaintiff in the settlement agreement would be allocated between Zhang's workers' compensation claim and employers' liability claim.

22